The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Thank you. You can be seated. It's a special honor today for us to have with us District Judge Richard Gerber from the District of South Carolina. He's real smart and he's agreed to come up here. We had some special cases. He agreed to come up here and help us out, so welcome Judge Gerber. Glad to have you here. Thank you. Alright, Ms. First, whenever you're ready. Thank you, Your Honors. May it please the Court, my name is Rachel First and my partner Thomas and I represent the plaintiffs. The essential facts of this case are that Ben McGovern, the defendant's manager, cut staff in a nursing home to save millions of dollars. Who was he a manager of? He was a manager of the nursing home at issue. Okay. Why are the punitive damages in this case assessed against all three defendants if he's a manager solely of the nursing home at issue? Because all of the evidence that we put in showed that he was employed, hired, and managed by all three defendants. How is that possible? Is that typical? I mean, that doesn't make any sense to me that someone could be employed by three separate entities. In the nursing homes, we frequently see this type of dynamic. There is a corporation set up that just has a name on the building. There is one as an institution. Well, that may suggest that you may have a Pearson claim or some other basis for assessing liability, but that's my concern in this case is that you've lumped these three defendants together, these LLCs or whatever they are, and assessed punitive damages against all three. And it doesn't make sense to me that these employees, managers, whatever you want to call them, could possibly be employed or managed by all three entities. The evidence that we put in was that, and it came directly from the business manager's mouth, that they worked for all three. Where is that in the record? The business office manager is Peggy Singletary. Her testimony is contained in the early part around pages 250, and she said that these individuals were all employed by these same defendants. In fact, she said in pages 225 to 226 and 233, as a business office manager, that they were employed by and managed by these defendants. Not only did Peggy Singletary say it, but one of the other administrators who testified, Pamela Street, who was an administrator, said that she had been hired by these defendants. And Ms. Street said in the appendix around page 645 that this was well-known. Are there any other employees or agents who would be characterized as managers who have a relationship with any of these defendants? Yes, Your Honor. All of the witnesses, including Peggy Singletary, the business office manager, Gwen Moore, a nurse, Myra Dotson, a respiratory therapist, and Pam Street, one of the administrators, they gave testimony that they were employed by, worked for, and were managed by these defendants. Well, what I'm asking is, I know there were some calls to 800 numbers. There was a visit from the corporate office, from the national office down, regarding these complaints. Wasn't there some testimony that somebody got fired? A scheduler got fired and complained about inadequate staffing? Yes, Your Honor. Do we know who those people are who came from the national office and what role they played? We do know one of them. His name was Don McHale. There was testimony at trial that he, and in the evidence, that he was one of the people who came down. He was, according to the documents which are in evidence and the testimony, he was the regional office manager for CARE 1. And in this case, CARE 1 had the entire contract to manage the nursing home. They managed everything from top to bottom. And that was undisputed testimony. All of this is direct and uncontroverted. And the only member of CARE Virginia, excuse me, is CARE 1. And the testimony from the business office manager was that this facility was managed 100%, according to the business office manager, Peggy Singletary, by CARE 1. They managed everything. They had handled hiring, firing, and budgets. Was there any secret that there were mass complaints down in the nursing home that there was inadequate staffing? There were no secrets. Everyone knew it. In fact, they were complaining all the way up to the top. It was in the state reports which were sent to the corporate offices. So the state knew this, the individuals complaining, and the family were told they could call CARE 1. And the testimony was that they were told to call CARE 1 when they had complaints. Could there be liability simply by condoning this condition? There certainly can be. And what we would say is when corporations hire a manager, those corporations have liability when the manager takes action. They are responsible for the person that they put in place to manage the corporation. And when they put this person in charge of a health care facility, they are responsible for his actions, for Ben McGovern's actions. Okay, so let me go back to that. So maybe you said this earlier, but who did Ben McGovern work for and where is that in the record? Ben McGovern worked for CARE 1, CARE Virginia, and Blue Ridge. Where is that in the record? So in the records you can find his information regarding who employed him on pages JA 225 to 226, 233. And there are direct documents that Ben McGovern signed as the CARE 1, CARE Virginia employee. Where is that? JA 1347 to 1348, 1341 to 1342. Those are for the nurse, one more, and for Ben McGovern. The business office manager, Peggy Singletary, made these statements in Joint Appendix 218 to 219, 233 to 235, 239 to 240. The record is rife with the statements, not just from the business office. Point me to one statement where this witness says that he's employed by all three entities. Can you read it to me? Ben McGovern did not attend the trial, so he personally did not make any statements. No, no, anybody. Yes, Your Honor. And maybe you can do that on rebuttal. Yes, Your Honor, and I would like to reserve some time for rebuttal. So one of the – you can even look at – we had two exhibits. One of them is entitled, What Shows CARE Virginia Operated Blue Ridge Health Care Center? And one is entitled, What Shows CARE One Operated Blue Ridge Health Care Center? And those are Joint Appendix 1379 to 1378. These companies hired these individuals. They managed them. And according to the agreements, they were in charge of them. Under North Carolina law, there is a public policy that there are safety laws in place. Ben McGovern was put in charge of this nursing home, and he was allowed to cut over a million and a half dollars in staffing alone. He did that in the face of warnings that understaffing would affect patient safety. He knowingly violated federal and state laws, having been warned that in doing so it would mean they could not keep the patient safe. And these are patients who relied on breathing machines to live. They had to have their air. He created a real risk of injury to the patients. And he did that telling his staff that he was cutting costs no matter what. He was the new sheriff in town. The testimony was that the prior administrator, Darrell Taylor, left because CARE One wanted him to cut costs in staffing. He wasn't willing to sacrifice patient safety. Ben McGovern made no secret of the fact when he was brought in that he intended to cut costs and cut staff no matter what, no matter what the consequences. And he did that, and when he did that, as a result, three people died. In this case, in order to recover for punitive damages, we the plaintiffs were required to prove the existence of one aggravating factor, fraud, malice, or willful or wanton conduct by clear and convincing evidence. In addition, for a corporation, we were required to show that the officers, directors, or managers participated in or condoned the conduct, giving rise to the aggravating factor. And under North Carolina law, we believe the trial court was in error when it was unable to view the direct evidence and instead looked for things such as who owned the corporation in corporate minutes. Instead, it looked for evidence of something higher than a manager. And under North Carolina law, the cases are very clear, that the person in charge, the person who is titled manager, the person who can make decisions on hiring and firing and can cut a million and a half dollars from a budget, that's a manager. Is Mr. McGovern the principal individual that you're relying on for your theory of liability? He is one of them, Your Honor. Who are the others? There was testimony that it's not just Benjamin McGovern as the administrator, but directly underneath him additional layers of managers, the director of nursing and the director of respiratory therapy. They also supervise individuals and manage the nurses and the respiratory therapists. And these individuals also had knowledge that the facility was understaffed. They literally did not have a registered nurse working in a unit that had patients on ventilators, and they knew it. They set the budget so they would not have these nurses. North Carolina community damage law requires corporate liability to be both. You have to either participate in or condone. I'm interested in any of the care. You mentioned Mr. McHale. Is it your assertion that Mr. McHale condoned this local violation of law? It is. We would say that Mr. McHale and everyone in the corporation condoned this. There was information that Ben McGovern cut a million and a half dollars. He understaffed this facility. And there were state surveys that showed this. And after this, no one made any changes to put enough staff to meet federal and state law. And there were warnings that people were in danger, that people were dying. And in response to that, the person in charge says, I'm the sheriff, I'm going to cut costs no matter what. And that is the one thing you cannot have in a health care facility. There's no question that you cannot cut costs no matter what when you've been warned that patients are in danger. Connected to the actual deaths of the plaintiffs here, Baird, Jones, and Key, can you connect how this, what you assert to be this violation of law, regarding understaffing, contributed or approximately caused the deaths of each? I know Mr. Baird, there were 12 hours or so. It was banging on his neck. Yes, Your Honor. Did not have an alarm on. How does that connect to this understaffing? Well, I would say that for Mr. Baird, there is evidence in the testimony, including the last person who cared for him, that he was not able to check his alarm. He didn't even check to make sure the man's breathing alarm was on, and he needed a ventilator on to live. Well, how does that understaffing relate to a failure to turn his alarm on? He stated, and there's testimony, that he did not have time because he was so busy that night to get around to checking it. So there was a man in the facility, and no one set his alarm. When he was banging, no nurse responded, no nurse assessed him. So he was banging, and eventually found his machine turned off completely, and no alarm sounded. Do you think a reasonable jury could base that evidence to conclude that there was a connection between corporate manager conduct and the death of Mr. Baird? Correct, because we are required only to show that the conduct is related to, not proximate cause, as the word causation is not even in the statute. And a reasonable jury did, in fact, find that. How about Jones? With Ms. Jones, the testimony is when she came back in, there was no nurse who assessed her when she had a problem and an alarm went off. It sounded, and no one responded. Her son was present, and he testified. No one responded. He had to go out in the hall and find someone. He finally tracked a person down who came in, literally went over to the machine, shut off the alarm, and walked right back out. No assessment was done to find out where the alarm on her breathing machine was sounding. And on those machines, when an alarm sounds, it means danger. And then after that, after she'd been that way for over an hour, then someone came in to change her tubes. And in doing so, they found that no one had set the bedside up prior to their arrival. So all the necessary equipment wasn't there. So he had to go running around trying to find extra tubes. He couldn't find a nurse to get the equipment. The staff in the room couldn't leave because there weren't enough people there to make sure the equipment was there and then to find it when they needed it. So the testimony is when Ms. Jones was in danger and needs help, she spent 15 minutes without air because they were running around trying to find what they needed. And what's the effect of being agnostic for 15 minutes? Well, there's no one I know who can breathe that long. You die. And that's what happened to all of these three people. They suffocated and died. How about Key? Ms. Key, throughout the night, on the night she died, she needed a sitter. She was having problems. The direct testimony is that the staff said, we know she needs a sitter. We don't have the staff. So she was left unattended. And nobody knows exactly how she died. She was found with her entire breathing apparatus pulled out. And she died in the night. And the state came in and said on that exact night they didn't have a registered nurse and they were understaffed. And all the people there that night said we asked for a sitter. And there's much evidence that they asked for sitters. They asked for extra respiratory therapists. They asked for nurses. And they were not given the staff. And Ben was told this created a dangerous situation. We're in a unit that is a ventilation unit. Correct. These are ventilation-dependent or near-dependent patients. They are. Correct. So there are higher requirements for this because people cannot go 15 minutes without air. And they knew this. And so there was conscious understaffing and cutting costs when they knew that there had to be enough patient minimums to keep these people safe. I'd like to reserve the final five minutes for rebuttal. Thank you. Thank you. Mr. Brown. May it please the Court. My name is Gregory Brown, and it's my great privilege to appear before you and argue on behalf of the defendants. While many issues and sub-issues have been raised in this proceeding, the alpha and omega of the matter is North Carolina's statutory provision prohibiting the imposition of damages on the basis of vicarious liability. And that is found in NC GENSTAT 1D15C. There are few principles in North Carolina law that are as clearly enunciated and well-settled as the legal mandate from the legislature that punitive damages may not be awarded against one as a result of the acts or omissions of another. Instead, punitive damages may be awarded against a company if the company's officers, directors, or managers participated in or condoned the conduct. Let me ask you this. Who do you define as managers? Judge, I believe that Judge Tyson's dissenting opinion in the Miller case is particularly instructive. It is in the briefs, and Judge Tyson goes through an analysis in the context of limited liability companies and punitive damages statute, which is particularly incisive here because a limited liability company, as opposed to a restaurant business or a bar, as some of the cases that have been cited, a limited liability company is managed. Its officers and directors are managers. They are member-managed LLCs. Is the nursing home administrator a manager? The nursing home administrator can be a manager. Was Mr. McGovern a manager? Mr. McGovern was a management-level representative for the Blue Ridge facility prior to Mr. Baird's death. Now, it's important to point out. Yes, sir. I don't understand that. Yes, sir. Was he a manager under the meaning of the statute? Ben McGovern, I would contend, is not a manager under the meaning of the statute, as Judge Tyson announced it in the Miller case, that he is not a member or a manager of the LLC. He is not an officer, and he is not a director. But the statute says a manager in the North Carolina law traditionally defines a manager as someone who supervises someone. Is a nursing home administrator under North Carolina law mandated to be operating the facility, and that required under North Carolina law? Yes, sir. So under that, Mr. McGovern would be a manager if that definition were used? Yes, sir. And who else would be a manager under that definition? Who supervises someone who would have potential liability? Would Mr. McHale be a manager? No, sir. Why is that? Mr. McHale, first of all, did not work for Blue Ridge of Raleigh LLC. How about the company he worked for? Did he have a role with in condoning or participating in this violation of law? No, sir. Did he come to the facility when there were complaints? He came to the facility. I'm sorry. Complaints about understaffing? Was he aware of that? Mr. McHale came to the facility after Delray Baird's passing and was part of the team that came in to investigate, and part of the decision, I believe, when Mr. McGovern was terminated from the company. Mr. McGovern was not the administrator in the months preceding and surrounding Ms. Jones or Ms. Keyes' passing. Ms. Street was? She was temporarily there. Was she there when they died, when Keyes and Jones passed away? Your Honor, I would have to look at the record because I know she testified that she left, and I don't recall that she was actually the nursing home administrator on those days. Somebody was the nursing home administrator. Yes, sir. There was pointed out to us a document in page 1342, which is a Code of Conduct and Employee Signs, and it lists together CARE 1, CARE Realty LLC, Elk Bridge Mansion. They call themselves the companies, and on signing on behalf of all those companies is Ben McGovern. Is that right, Ron? Yes, sir. Your Honor, Judge Boyle correctly identified and Judge Boyle correctly applied the law in this case. Mr. Brown, does that mean that Mr. McGovern was a manager for all of these companies? I'm sorry, Your Honor, I did not hear you. Does that mean that Mr. McGovern was a manager for all of the three corporate companies? No, sir. Why not? CARE 1 LLC has no employees. And Mr. McGovern was neither a member nor a manager of CARE 1 or CARE Virginia. I think we're past that, though, because I think the law is clear in North Carolina that a manager is someone who directs or manages something cited to Judge Tyson's dissenting opinion, but that's a dissent. Yes, sir. So let's assume for the moment that a manager is as broad a definition as it appears to be. So given what Judge Gergel just pointed out to you regarding this Code of Conduct document that was signed by Mr. McGovern on behalf of all three companies, is that enough to tag him as a manager for all three entities for purposes of the punitive damages statute? No, sir. I do not believe that signing this Code of Conduct that Ben McGovern signed converts him to a manager of CARE 1 or CARE Virginia LLC, nor do I believe that that shows the type of participation or condemnation of these corporations or, excuse me, these companies, regarding the decisions that would have had to have been made with a certain level of mens rea in order to lead to liability under the punitive damages statute. What kind of mens reas? Sir, under the punitive damages statute, the aggravating factors set forth in the statute itself establish the standard for the aggravating factor. And, for instance, fraud will suffice. Constructive fraud will not unless an element of intent is present. Malice will suffice, but it is defined as a sense of personal ill will. Willful or wanton will suffice expressly, but that means the conscious and intentional disregard of and indifference to the rights and safety of others. Right. So it's not a wickedness when Judge Boyle indicated the requirement for wickedness. That would not be correct, would it? Your Honor, referring to Judge Boyle's order, he was citing to several cases and a Fourth Circuit case in which he was interpreting those terms in the statute in which the use of the word wicked was, I believe, illustrative. I understand. But you agree with me, wickedness is not required in the punitive damages? I would agree with Your Honor that the term wicked is found nowhere in the statute. But I don't, in terms of the interpretation of whether wicked is synonymous with malice, maliciousness, intent, and deliberate, excuse me, conscious indifference, I would suggest that those are synonymous and that the use of the term wicked as it was used by the Fourth Circuit in the case that Judge Boyle cited or when Judge Boyle used it, that it would be synonymous but not expressly delineated as a term. Mr. Brown, if you look, there's actually, in the statute, you know it better than I do, that 1D-35 actually gives us some examples of what would be egregiously wrongful acts. One of them is the reprehensibility of defendant's motives and conduct. Would cutting back staff below state levels in an event unit be potentially reprehensible? Your Honor, I would submit that potentially, but that is not what the evidence showed here. I understand. Does that mean the likelihood of serious harm if you understaffing venue? Do you think there's a likelihood of serious harm to the patient? I don't believe that in and of itself the concept of an overworked staff or a busy staff or the notion of making staffing decisions can be said to translate to a reprehensible intent or a maliciousness by the person making that decision. But the statute doesn't require it. It says conscious indifference. Conscious and intentional indifference. And what we would submit is that where it says conscious and intentional disregard of and indifference, and what we would submit is that Judge Boyle sat through the trial, Judge Boyle heard all of the evidence, and what Judge Boyle found wanting was any suggestion, any testimony, that any of these management-level individuals who could, upon whose shoulders blame could be laid, was not introduced into evidence in terms of their mens rea. In fact, Judge Boyle refers to them as the unidentified and unnamed officers, directors, or managers of the defendants. You heard in my opponent's opening argument before you, you heard director of nursing or other individuals. That was the problem with their case. There was simply no one who was brought forward to testify, no one who could speak to the individuals who made the actual decisions and their state of mind. Ben McGovern came in and said, I'm the new sheriff in town. Ben McGovern cut costs for things such as the quality of the food, according to Gwendolyn Moore. He made comments that offended some of the staff regarding personal issues. Ben McGovern did not make a decision to cut staff below the minimum levels, and there was no evidence of that. There was no evidence that there was staff below the state minimum level? Wasn't there a report from the state actually documenting that? Sir, there were, in fact, and that is one of the issues with what we contend is the problems with the plaintiff's case. Elizabeth Jones, the state found that the claims were unsubstantiated. There were suggestions and there were different arguments that at points this unit was understaffed. But the problem is, and then Judge Boyle points this out in his order, he says that goes to liability, to negligence. But there was simply no evidence that an individual who could be said to participate or condone on behalf of the LLC or any of the LLCs sat down and said, we are going to understaff this unit. I am going to do this and I am going to do it with the knowledge that it will hurt patients. There was simply no evidence of that. And I would point out in my last few minutes that it is critical that the plaintiff's effort to obtain punitive damage against a company turned entirely on proving that the company's officers, directors, or managers acted with the requisite intent. And yet, they chose to present no such evidence at all. They did not depose any 30B6 witnesses and also, presumably for their own tactical reasons, chose not to call any witnesses at trial who were officers, directors, or the managers or members of the limited liability companies. In his order, Judge Boyle notes that plaintiffs could not even name or identify any officer, director, or manager of the limited liability companies upon whose shoulders responsibility for the aggravating conduct might be laid. Who did Don Hales work for? Don Hale worked for Care Virginia Management, LLC. Don McHale, sir, I believe. In fact, at pages six and seven of his order, Judge Boyle referred to these individuals as these unnamed and unidentified officers, directors, or managers. The plaintiffs likewise did not introduce any documentary evidence such as meeting minutes, company policies, internal memoranda, or any other type of evidence from which a jury could conclude that the defendants participated in or condoned the aggravating conduct or that they did so with intentional or malicious purpose. It is not just that they didn't present any damning company documents. They didn't present any company documents at all. Judge Boyle was thus manifestly correct to conclude that the plaintiffs utterly failed to meet the high burden that North Carolina law imposes for obtaining punitive damages against a company. And there is certainly nothing anomalous about his conclusion. Your Honors, punitive damages awards are rare in North Carolina and even rarer in medical malpractice cases. In fact, there is only one reported North Carolina medical malpractice case in which a jury verdict awarding punitive damages was ever upheld, and that is the Chambliss case. And in that case, and this is important, they were awarded against an actual, a specifically identified tortfeasor, a nurse, who knowingly, consciously, and deliberately used an unlabeled syringe containing an unknown substance, knowing that to do so would expose the plaintiff to harm. As Judge Boyle correctly concluded, there was nothing like that here. The plaintiffs did not even identify any purported company tortfeasor, let alone present any evidence that any company tortfeasor actually committed the aggravating misconduct with the state of mind that North Carolina law requires. In closing, Judge Boyle correctly identified and recited the law. Judge Boyle correctly applied the law to the facts and trial record here. And Judge Boyle correctly concluded that the plaintiff's evidence was lacking and wanting for these crucial elements. We therefore respectfully ask that the Court affirm Judge Boyle's rule. And, Your Honors, I would ask to reserve five minutes for rebuttal, and we did raise cross-appeal issues regarding Elizabeth Jones that I will address on our server plot. Thank you, Mr. Brown. Thank you, Your Honor, for allowing me to present. Ms. Burris, reply. Yes, Your Honors. First, to address Judge Diaz, your request. If you look in Document 44 from pages 4 through 7. I'm sorry. I apologize. Ms. J.A., are you referring? I'm in our brief. We quoted excerpts directly from the testimony, and that's the most succinct way to address it. Document 44, Your Honor. Are you referring to page 44? Four. Document 44, page 4. So it is our brief. These are the questions asked to the business office manager on the stand. When you worked at Blue Ridge, did you work in the administration of CARE 1? Yes. Did you work in the administration of CARE Virginia? Yes. What was CARE 1's involvement in the nursing home? They owned and operated the facility. How much control did CARE 1 exercise over the finances at Blue Ridge? 100%. Do they set the budgets there? Yes. Then the business office manager went through every single person by name, Administrator Taylor, Administrator McGovern, Administrator Street, each director of nursing. When you're referring to CARE 1, I mean there are three entities here. Which CARE 1 are you talking about? Which CARE 1 was she talking about? Well, there is CARE 1, and so it was sued as CARE 1 LLC doing business as CARE 1, CARE Virginia Management LLC doing business as CARE Virginia. And she testified at trial that all three did business as the Blue Ridge Nursing Home. And I would point out, Your Honor, that the defendants brought no fact witnesses to controvert this evidence and no witnesses on standard of care. So all of the evidence from all of the former employees was completely uncontroverted. There was nothing put into evidence in dispute. So all of this testimony is undisputed from the business office manager, from one of the former administrators. They all explained this. And she went through each person individually and explained that they worked for these companies. And so, for example, they said their paychecks came from CARE 1. That's on page 6 of the brief. Nurse Gwendolyn Moore said that. And on pages 1340 through 1349 of the Joint Appendix and 1378 through 1379, you will see that there are documents from Don McHale, the CARE Virginia, and it says his title, Regional Manager, letting the state know that he has hired the Director of Respiratory Therapy, whose name is there, and also that he has hired Ben McGovern as the administrator. He advised the state that he, on behalf of, and it says CARE 1, so he acted on CARE 1's behalf, even though he technically worked for CARE Virginia, that he had hired these people, and he told the state that. So all the documentary evidence, they sent to the state. What if it's that Mr. McHale either participated in or condoned the understaffing at the nursing home? By hiring the managers, and specifically Ben McGovern. They put this person in place, and a corporation is liable. So that would be vicarious liability. Do we know what Mr. McHale himself did? Anything that he did, was he aware of these complaints? Do we have evidence of that? We know that he was present at the meeting that was held at Blue Ridge when people were complaining and saying it was understaffed. He was made aware of that. He was. In fact, Don Jones, Liz Jones' son, had multiple conversations with him and complained to him. One of the complaints she made that was heard at trial was that Ben McGovern threatened to withhold necessary care for his mother if he didn't agree to move her to another room. He said he wouldn't, if her alarm went off, they might not respond to it. So we know he was on the ground after that. He came there. We also know that after complaints were made to headquarters, he came back down and had the meeting. He showed up, and there was a meeting. And following that, what we know is no one increases timing. Was it after one death and before others? What do we know about that, about when that timing of that meeting? We don't know the exact timing of that meeting. We do believe that it happened sometime around the time of Mr. Baird's death. But we don't know exactly. And in part, they fired the staffing coordinator, and she was sent off. So she was gone. And they hired somebody who didn't know how to staff following that. But they never increased the staffing. So the situation put in place by Ben McGovern of the gross understaffing and the gross cost-cutting was never changed. And when they put a manager in place, a corporation is responsible. I would say it's not vicarious liability. You were responsible for your acts and your policies. And if you have acted to leave a place understaffed, when you know it violates federal and state law and you don't have the people to care for people who have to live on breathing machines, you are responsible when they are harmed after you have been warned that there are not enough people to keep people safe and out of a dangerous situation. This is a health care facility, and the people of North Carolina deserve more. Thank you, Your Honors. Ms. Brown? Yes, sir, Your Honor. Your Honor, in response to the earlier question, Pamela Streep was the nursing home administrator for during the period of February 6, 2012, which postdates Delray Baird's passing, and to March 5, 2012, which includes Ms. Jones but predates Betty McKee's passing. Your Honor, on our cross-appeal, we have raised the issue of Elizabeth Jones's, the claims regarding Elizabeth Jones. And we think that it is important because it also bolsters our claims regarding the absence of evidence to support a verdict regarding these issues of understaffing as they pertain across all of the three decedents because of the varying differences in the mechanics of injury with each person and a close examination of both the state of the decedents when they came to the hospital, the facility, excuse me, but also, importantly, how their circumstances led to their passing is very instructive to show that, in our first instance, issues such as Ben McGovern have nothing to do with Elizabeth Jones, for instance, or Betty McKee. And that's why we contend that there's no possible way to say that there's a corporate policy or that somehow they acted with this malicious intent to harm individuals. Well, but staff cut McGovern, but the staff then brought up after that, before the deaths of Jones and Keefe. Yes. Is that correct? Well, I'm sorry, Your Honor, I interrupted you. Yes, go right ahead. I'm sorry. Your Honor, our contention is that there was no evidence that Ben McGovern personally cut staff. That's part of the problem, and that's what he was the nursing home administrator. But there was no evidence that Ben McGovern came in and said, I'm going to purposely understaff, and I'm going to do so knowing that will harm patient care. And the important part of Your Honor's question, I believe, and I'll try to answer that, is that Elizabeth Jones, the regulatory officials who came in to examine Elizabeth Jones, found that any claims of understaffing or any such thing worked. What were the circumstances of her death? Wasn't that the one with the endotracheal tubes, proper endotracheal tubes, proper staff, were available at bedside, and she became anoxic for 15 minutes? Sir, what happened with Elizabeth Jones is that she, at her family's request, she came back to Blue Ridge, even though Blue Ridge had originally said, this is probably not, we'd like her to stay at the long-term care facility called an LTAC. She comes in with what's known as a transesophageal fistula, a hole between the two. Yes, sir. And during the day, her son moves her. After she's been there, her son moves her, and by moving her, she goes into cardiac distress. Now, at that point, she has a functioning trach tube. Her nursing staff, Myra Dodson, and this is where it's very important, is Myra Dodson, who was called by the plaintiffs and was qualified as an expert, claimed under oath, and we would point to the trial testimony by Ms. Dodson, in which she said all of the necessary people attendant to Ms. Jones were present in that room, and everyone there met the standard of care. What happened was that during the changing of her tubes, there were multiple tubes in the room, but during the changing of the tubes, it was determined that possibly she could use or should have a longer tube due to the fistula. Had she had a longer tube before? She did. She had only been there for a few hours, and they secured the longer tube, and as they're administering to her, EMS has arrived at this point, and her son says she's a do-not-resuscitate. So this notion that Elizabeth Jones sat anoxic for 15 minutes is entirely controverted by the facts and the trial record. Well, let me read you an excerpt from Ms. Dodson's testimony. She testified, and I'll grant you, I guess, that she said that those who acted once the emergency occurred acted within the standard of care, but then she also testified that, quote, Jones did not have her bed set up with the trach that she was supposed to have, and not having that proper trach tube available was a breach of the standard of care. What's wrong with that opinion? Couldn't the jury credit that opinion? Well, the jury could credit that opinion of saying that prior to Ms. Jones arriving in the room, there was something called an ambu bag, and that perhaps there should have been a second tube of a different length than the two tubes that were there. But that would go to liability in terms of a question of- Isn't that what we're talking about here? Yes, sir, we are talking about that, but what we're saying is that if we look at Ms. Dodson and we look at her testimony and we look at everything she said, she says, I performed within the standard of care. She can offer a straight comment that not having this tube may have breached the standard of care, but she says that the providers that are in the room, the ones who are delivering care to her, met the standard of care, and that's what we think- If you don't look at this in isolation, you look at the entire process from beginning to end, and if anywhere along that chain there was a breach of the standard of care and that standard of care approximately caused this woman's death, then the jury could credit that evidence and find against your client. Your Honor, we would contend that the evidence that was at trial with her and that whole entire colloquy that Your Honor has referred to, we think is compelling on that subject of the standard of care as it relates to Elizabeth Jones. And what we would further suggest is that nowhere is it suggested that an inadequate number of people in the room had anything to do with this. And so we would close by saying that we believe that Elizabeth Jones' focus on that patient bolsters our argument regarding punitive damages. Thank you, Mr. Brown. Thank you, Judge. Thank you, Your Honor.
judges: William B. Traxler, Jr., Albert Diaz, Richard Mark Gergel